[Cite as *State v. Adams*, 2019-Ohio-3597.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-180337<br>TRIAL NO. C-18CRB-6204 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| TROY ADAMS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Municipal Court

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  September 6, 2019

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Ronald W. Springman*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller,* Hamilton County Public Defender, and *David Hoffmann,*  Assistant Public Defender*,* for Defendant-Appellant.

**BERGERON, Judge.**

{¶1}    Presenting a counterfeit check can support a conviction for theft by deception when the defendant acts knowingly, as the trial court here found.  We accordingly affirm the underlying conviction in this case.  But when we shift the focus to the restitution award, the General Assembly has carefully circumscribed who can qualify as a "victim" capable of recovering an award of restitution.  On the facts at hand, the third party bank here fails that test, and we accordingly reverse the award of restitution to it.

I.

{¶2}    In search of employment, defendant-appellant Troy Adams alleges he reached out to a man known within the neighborhood only as "Brian" in the hopes of retaining work, specifically manual labor (i.e., tearing down drywall, rebuilding parts of homes).  Brian obliged, setting up an arrangement by which Brian would pick up Mr. Adams and other individuals and transport them to the work sites, charging them five dollars per trip, and then return the workers to their home at the end of the day.  It remained unclear who, exactly, was to pay Mr. Adams for his efforts, but he expected regular payments.  After about two weeks, growing concerned about the lack of a check, Mr. Adams asserts he confronted Brian about his tardy paycheck.  Shortly thereafter, Brian allegedly paid him by check, issued by RPI Plumbing Inc. ("RPI") to Troy Adams in the amount of $807.51 and signed by an individual other than Brian.  After receiving the check, Mr. Adams proceeded to his own PNC Bank branch ("PNC") to cash the check.

{¶3}    The problem was that RPI had never issued any such check, casting doubt on the accuracy of Mr. Adams's entire story.  In a subsequent investigation, an RPI employee discovered six checks not issued by the company, but nevertheless drawn on the company's

account. One of these counterfeit checks proved to be the one cashed by Mr. Adams, which prompted his arrest and charge for theft by deception.

{¶4} At trial, RPI's office manager testified that Mr. Adams had never been an employee of RPI, nor had the company issued a check payable to him. Additionally, RPI's office manager, as well as a PNC bank fraud investigator, confirmed that the check cashed by Mr. Adams was indeed a counterfeit. The trial court also heard from Vanessa Storer, a PNC bank teller, concerning her interactions with Mr. Adams on the day in question and his odd demeanor when cashing the check.

{¶5} Mr. Adams testified in his own defense, focusing on Brian's conduct and laying any blame at his feet. To explain his possession of the check, Mr. Adams repeatedly asserted that he believed the check to be valid, assuming Brian worked as a contractor for a company who then paid his workers with "contract checks." After receiving the check from Brian, Mr. Adams presumed that RPI was the company Brian worked for as a contractor. Based on this series of assumptions, Mr. Adams cashed the check at PNC.

{¶6} Ultimately, the trial court found Mr. Adams guilty of theft by deception and ordered Mr. Adams pay restitution in the amount of the counterfeit check to PNC. Mr. Adams now appeals, challenging two aspects of the proceeding below. First, he questions both the sufficiency and manifest weight of the evidence, and second, he argues that the trial court abused its discretion in ordering Mr. Adams pay restitution to PNC. Although we overrule Mr. Adams's first assignment of error, we sustain his second assignment of error relating to the restitution.

II.

We begin with Mr. Adams's weight and sufficiency challenges. When reviewing the sufficiency of the evidence to support a criminal conviction, "the question is whether after

3

reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt." *State v. Pettus*, 1st Dist. Hamilton No. C-170712, 2019-Ohio-2023, ¶ 52, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.  On the other hand, when reviewing the weight of the evidence, we must "examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the court clearly lost its way and created a manifest miscarriage of justice."  *Pettus* at ¶ 52, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶7}    Mr. Adams maintains that the state failed to prove beyond a reasonable doubt the requisite mens rea for theft by deception pursuant to R.C. 2913.02(A)(3).  Under R.C. 2913.02(A), "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: * * * (3) [b]y deception[.]"  Relevant to the theft statute, "deception" is defined as:

> knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact.

R.C. 2913.01(A).

{¶8}    In turn, a person acts "knowingly" when "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.

4

A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). Further, "[w]hen knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." *Id.* We typically consider circumstantial evidence surrounding these events to evaluate intent, absent a defendant's admission. *State v. Capone*, 8th Dist. Cuyahoga No. 86281, 2006-Ohio-1537, ¶ 32 ("Because intent lies within the privacy of a person's own thoughts and is therefore not susceptible to objective proof, intent is determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts.").

{¶9} Although the evidence here was far from overwhelming, the state provided sufficient evidence to support that Mr. Adams acted with the purpose to deceive RPI by his false representations as to the validity of the check. At trial, the RPI office manager confirmed that Mr. Adams had never been an employee at RPI and that the company had not issued a check to him. While Mr. Adams insisted that he received the check as payment for working for a contractor, Brian, the check itself was not signed by Brian (who was nowhere to be found at this point) and was instead issued by RPI. Further, Mr. Adams admitted that, during the time he worked for Brian, he never engaged in any plumbing work (RPI's line of work, as apparent from its name), but instead mostly tore down buildings and walls. Additionally, on cross-examination, the state elicited testimony from Mr. Adams concerning the time he initially worked for Brian (about six days, eight hours a day) and his hourly pay ($12) to establish that these hours did not add up to the amount on the check ($807.51), but rather to a completely different figure ($576). The state also provided

evidence from Ms. Storer, the PNC teller who cashed Mr. Adams's check. Ms. Storer described Mr. Adams's odd conduct during their exchange, providing a debit card from another bank when asked for identification, noting his actions raised "a little bit of a red flag." When Ms. Storer inquired further about whether he had an account, Mr. Adams told her "he did, but not to worry about using it."

{¶10} And, of course, the trial court as trier of fact remained free to disbelieve Mr. Adams's story based on its own credibility assessment. Recall that, pursuant to R.C. 2901.22(B), the state may establish knowledge if Mr. Adams subjectively believes that there is a high probability that the check was a counterfeit and failed to make inquiry concerning its legitimacy. *See State v. Octavio*, 5th Dist. Stark No. 2016CA00092, 2016-Ohio-7661, ¶ 18 (upholding theft conviction when the defendant presented the ostrich defense and failed to make an inquiry or averted his eyes to the truth). Based on the circumstantial evidence the state provided (that we surveyed above), sufficient evidence existed to uphold the conviction. Therefore, viewing the evidence in the light most favorable to the state, a rational fact finder could find that Mr. Adams purposely deprived RPI of its money by knowingly obtaining control over the counterfeit check and successfully presenting that check to PNC.

{¶11} Turning to his weight of the evidence challenge, the trial court did not go astray here. In light of the evidence presented at trial, the court had at its disposal testimony from the RPI office manager, the counterfeit check, testimony from Ms. Storer regarding Mr. Adams's conduct on the day in question—not to mention the disconnect between the rate of payment and the check, and Brian's elusive nature. While the trial court heard testimony from Mr. Adams disputing the state's evidence, the judge, as the trier of fact, could allocate weight to each party's testimony as appropriate and did so here, finding

6

Mr. Adams's story concerning Brian the contractor unpersuasive. Therefore, the record does not support a determination that the trial court lost its way in finding Mr. Adams guilty of theft by deception and produced a manifest miscarriage of justice.

**{¶12}** Accordingly, we overrule Mr. Adams's first assignment of error.

III.

**{¶13}** But as we turn to the second assignment of error regarding the restitution award, Mr. Adams's argument stands on a surer foundation. When reviewing a trial court's restitution order in a misdemeanor case, we apply an abuse-of-discretion standard. *State v. Gordon*, 1st Dist. Hamilton No. C-170660, 2018-Ohio-3786, ¶ 6, citing *State v. Lynn*, 1st Dist. Hamilton No. C-150569, 2016-Ohio-2849, ¶ 4.[1]

**{¶14}** As provided in R.C. 2929.18(A)(1), a trial court may order restitution "to the victim of the offender's crime * * * in an amount based on the victim's economic loss." Previously, R.C. 2929.18(A) permitted a court to award restitution to third parties, including insurers and banks. *See* former R.C. 2929.18(A)(1) (an order of restitution "may include a requirement that reimbursement be made to third parties for amounts paid to or on behalf of the victim or any survivor of the victim for economic loss resulting from the offense."). In 2004, however, the Ohio General Assembly struck the language in R.C. 2929.18(A)(1) that allowed the trial court to order restitution to third parties for amounts paid to victims for economic losses. *State v. Thornton*, 2017-Ohio-4037, 91 N.E.3d 359, ¶ 15 (1st Dist.), citing *State v. Aguirre*, 144 Ohio St.3d 179, 2014-Ohio-4603, 41 N.E.3d 1178, ¶ 1. In *Thornton*, this court interpreted the elimination of this language to mean that "unless the person or entity is a named victim as described in R.C. 2930.01(H)(1), the trial court may not order a defendant to pay restitution to that third party." *Id.*

---

[1] The standard of review for felony restitution decisions, by contrast, is not abuse of discretion, but rather the "contrary to law" standard emblazoned in R.C. 2953.08. *State v. Thornton*, 2017-Ohio-4037, 91 N.E.3d 359, ¶ 12 (1st Dist.).

{¶15} As a preliminary matter, because R.C. 2929.18 does not define victim, this court, as well as other Ohio appellate courts, has turned to R.C. 2930.01(H) to determine who qualifies as a victim for restitution purposes. *State v. Harris*, 2015-Ohio-4412, 46 N.E.3d 198, ¶ 8 (6th Dist.) (noting that under R.C. 2930.01(H)(1) "a bank which reimburses a customer/victim is not a 'victim' of the crime and, therefore, the trial court cannot require restitution to be paid to the bank."); *State v. Maurer*, 2016-Ohio-1380, 63 N.E.3d 534, ¶ 19, 25 (8th Dist.) (defining victim under R.C. 2930.01(H)(1) and finding that "where a bank reimburses a customer-victim but the bank is not named in the indictment, it is not a 'victim' under R.C. 2929.18(A)(1)."). In contrast, other Ohio appellate courts have refused to apply R.C. 2930.01(H)(1)'s definition of victim outside the scope of R.C. Chapter 2930. *See State v. Cartwright*, 12th Dist. Fayette No. CA2016-11-018, 2017-Ohio-7212, ¶ 13 (holding R.C. 2930.01's definitions, including "victim," have "no application to who a sentencing court may consider a 'victim' for purposes of restitution under R.C. 2929.18(A)(1).").

{¶16} R.C. 2930.01(H)(1) defines "victim" as a "person who is identified as the victim of a crime or specified delinquent act in a police report or in a complaint, indictment, or information that charges the commission of a crime and that provides the basis for the criminal prosecution * * *." This begs the question of whether a bank that reimburses its account holders for the direct economic harm suffered from the defendant's actions constitutes a victim within R.C. 2930.01(H)(1). Several Ohio appellate courts have already addressed this issue, finding that a bank that reimburses its customer-victim constitutes a third party falling outside the scope of an entity capable of receiving a restitution award. *Harris* at ¶ 8; *Maurer* at ¶ 25; *State v. Stump*, 4th Dist. Athens No. 13CA10, 2014-Ohio-1487, ¶ 12 ("A bank that reimburses a customer who has been a victim of a crime is a third-

8

party. As such, the bank cannot be awarded restitution from a defendant who stole from that bank's customer."); *State v. Kiser*, 2d Dist. Montgomery No. 24419, 2011-Ohio-5551, ¶ 16 ("PNC is a third-party who is not statutorily entitled to recover the costs of its decision to reimburse [customer] for the loss she suffered as a result of [defendant's] crimes."); *see State v. Allen*, 2018-Ohio-1529, 101 N.E.3d 734 (10th Dist.), *appeal accepted*, 153 Ohio St.3d 1452, 2018-Ohio-3026, 103 N.E.3d 830.

{¶17} Ultimately, we find *Thornton* dispositive of the restitution issue at hand. Because PNC was not named in the complaint as the victim (rather, it denominated RPI as the victim), the court could not order Mr. Adams to pay restitution to the bank. Under the governing statute, RPI qualifies as the victim of Mr. Adams's actions, whereas PNC sits as a mere third party. Accordingly, despite the fact that PNC reimbursed RPI for its loss, PNC is a third party bank that lacks statutory entitlement to recover the reimbursement it chose to make to its customer. Therefore, PNC is not a "victim" for the purposes of R.C. 2929.18(A)(1), and the trial court abused its discretion in awarding restitution in the amount of $807.51 to PNC. That does not mean, however, that PNC has no available remedy at its disposal—rather, it could seek to pursue Mr. Adams civilly at this point, *Thornton*, 2017-Ohio-4037, 91 N.E.3d 359, at ¶ 27 (Myers, J., concurring), and similarly-situated banks down the road might try their best to be included on the "victim" recitation.

{¶18} For the foregoing reasons, we overrule Mr. Adams's first assignment of error and affirm his conviction. We sustain his second assignment of error and reverse the trial court's order of restitution and remand for further proceedings consistent with this opinion.

Judgment affirmed in part, reversed in part, and cause remanded.

**MOCK, P. J.,** and **MYERS, J.,** concur.

Please note:

The court has recorded its own entry this date.