**[Cite as *State v. Cook*, 2024-Ohio-1664.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230235 |
| | | TRIAL NO. B-2002132 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| SHAMIYA COOK, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 1, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Sean M. Donovan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Bryan R. Perkins*, for Defendant-Appellant.

**BOCK, Presiding Judge.**

{¶1} Defendant-appellant Shamiya Cook challenges her felonious-assault conviction in two assignments of error, raising sufficiency and manifest-weight challenges. Specifically, Cook relies on expert testimony to argue that she struck her long-time abuser in a flight response and therefore did not act knowingly. But the trial court was entitled to disagree with her expert's opinion and reasonably found that the surveillance footage undermined her expert's conclusion. Because the evidence was sufficient to sustain her conviction and our deference to the trial court's credibility determinations, we overrule her two assignments of error and affirm her conviction.

## I. Facts and Procedure

{¶2} Dwayne Dickey, Cook's long-time abuser, is the father of Cook's child. Sometime after midnight in May 2020, Dickey fought Cook in a gas station parking lot. After Cook managed to escape Dickey and return to her SUV, she hit Dickey with her vehicle, pinning him under a wheel. Cook was charged with felonious assault with a deadly weapon in violation of R.C. 2903.11(A)(2) and felonious assault in violation of R.C. 2903.11(A)(1).

{¶3} At her bench trial, the state's case consisted of Dickey's testimony and surveillance footage of the incident. For her part, Cook raised battered woman syndrome as a defense.

### *The state's case*

{¶4} Dickey testified that he and Cook have "one or two" children together. He reluctantly testified that he was with Cook at a gas station, tried to get into a car, and was struck by a vehicle. He explained that he sustained injuries to his leg.

{¶5} The surveillance footage shows the physical fight and eventual car crash. It shows Cook pulling into the gas station alone and Dickey emerging from the back

seat of his friend's sedan. Cook walked off camera, and Dickey followed her. When the two reentered the frame, Cook grasped Dickey's sweatshirt, keeping him at arm's length. They wrestled and Dickey appeared to spit on Cook. Cook pushed Dickey away, regrasping his sweatshirt. The two began to walk across the parking lot toward Dickey's friend's sedan before Cook shoved Dickey for a second time. Dickey attacked Cook, throwing multiple punches.

{¶6} The two continued to wrestle. Dickey punched Cook before she threw him to the ground. She tried to retreat to her SUV, but Dickey ran toward her and delivered another punch. The two wrestled next to her SUV before Cook was able to create space between the two and reenter her SUV. With Cook in the driver seat and the windows down, Dickey appears to have hurled a squeegee at Cook.

{¶7} Dickey ran toward his friend's sedan before Cook veered around a gas station pump and rapidly accelerated into a bollard and Dickey, pinning him under the wheel of her SUV. Cook jumped out of her SUV and pushed the SUV off Dickey.

{¶8} On cross-examination, Dickey described his relationship with Cook, which began when they were adolescents. The relationship began to sour and while Dickey testified that the relationship was not abusive, he admitted that he committed domestic violence "[p]robably just one time." He acknowledged that he "used to" beat her up. But that was in the past, according to Dickey.

{¶9} Cook's counsel questioned Dickey about his criminal record, which included three domestic-violence charges that the state dismissed or ignored.

{¶10} According to Dickey, he was charged with domestic violence for hitting Cook in the face with a cell phone in November 2020, which resulted in a trip to the emergency room for Cook. At trial, he explained that she was "trying to take it from me" and he simply lost his grip. Dickey also acknowledged that he was charged with

domestic violence for harming Cook in 2018. Dickey admitted that he was charged with punching another girlfriend but explained that she contacted police because he "wasn't doing what somebody didn't want me to do." In fact, Dickey explained that he was charged with domestic violence because women "get mad." According to Dickey,

> That's where a lot of domestic violence charges come from. They make up something. They call the police, put you in jail. * * * They can just call the police and put a domestic violence on you to make sure you being pulled over or you're going down the street and you're going to jail for domestic violence.

### Cook's battered woman-syndrome defense

A. Expert testimony

1. *Dr. Fischer described battered woman syndrome*

**{¶11}** In her defense, Cook called Dr. Karla Fischer to testify as an expert on the psychological effects of domestic violence. Her expertise is "understanding the normal consequences of domestic violence and how [it] change[s] people's behavior and feelings and thoughts." She explained that "battered women's syndrome," or battered person syndrome, is shorthand for the psychological effects of domestic violence and is not a recognized diagnosis in the relevant edition of the Diagnostic and Statistical Manual of Mental Disorders.

**{¶12}** Dr. Fischer identified "three general factors" of a battered person—a "pattern of abuse," "coercive control," and "coping strategies that you would expect to see from someone who is trying to deal with abuse and coercion." She explained that "[d]omestic violence changes people * * * how they behave, how they feel, how they think about themselves, their relationships, and the background around them." Dr. Fischer testified that domestic-violence victims often do not seek external help. And

4

when they do alert the authorities, it is common to see charges related to the domestic violence dismissed.

**{¶13}** Relevant here, Dr. Fischer explained that fight-or-flight reactions are not conscious decisions, but the body's response to perceived danger. The fight-or-flight reaction is "System 1," and "decisions, our cognitive weight of options and risks and our strategy to engage in specific behavior" is "System 2." In domestic-violence cases, "usually the issue is someone who is reacting to danger in a fight or flight way." For a battered person, a "self-protection response refers to both System 1 and System 2 changes in the way that victims behave when they perceive danger."

**{¶14}** System 1 is "sort of an emergency situation in which the self-protection response is either to fight or flight." System 2 consists of "conscious decision-making," with victims "always trying to figure out how they can stop the violence from happening in the future," like therapy for their abusers or planned exit strategies. But in the moment, a victim's "visual perception is like a tunnel vision, you know, that there is no damage, no peripheral vision because, again, the brain is focusing on the – what the person needs to do to either fight or flight." A fight-or-flight response is automatic, akin to a person's breath or heartbeat. It is a "survival instinct."

*2. Dr. Fischer testified that the crash was a result of Cook's flight response*

**{¶15}** Turning to Cook's case, Dr. Fischer testified that she watched the video, reviewed Dickey's criminal history, and interviewed Cook over the course of four hours. Dr. Fischer explained that there were several violent episodes at the gas station. According to Fischer, Dickey was prone to physical and emotional abuse and described a pattern of "abusive, intimidating, threatening, or manipulative" contact that continued after the crash. Dr. Fischer testified that Cook was battered.

5

{¶16} Dr. Fischer was presented with a hypothetical fact pattern identical to Cook's relationship with Dickey and the crash in the case. Dr. Fischer testified that, while the alleged vehicular assault could be seen as a deliberate decision, she believed the crash was a product of the victim's flight reaction. Considering the history between the man and woman, Dr. Fischer agreed that crashing the SUV into the man was a flight reaction "because she doesn't really -- she's -- she doesn't have any other options once she gets into her car to get away from the situation by flight in that she's in her car, that's a vehicle that allows her to escape, and that's flight." Dr. Fischer also agreed that the reaction is consistent with a physiological reaction that "the brain-based flight response engenders."

{¶17} Dr. Fischer testified that Cook "did not intend to cause harm to Mr. Dickey." Later, she explained that Cook's fight-or-flight response was activated

> [W]hen she got into her car and had to duck to keep him from hitting her over the head with a pipe and she hit the gas. Somewhere in those few seconds between crouching under the wheel of the car and hitting the gas, that's when that – I think her – her trying to get to her car was a strategic, you know, decision. She's trying to get away from him first by just getting to her car.

B. Cook's testimony

{¶18} Cook testified in her defense. Her relationship with Dickey changed when she became pregnant with their child. They frequently argued and Dickey began stealing from Cook. She believed that after she became pregnant, "he felt like now I got you to myself. Like, I don't have to be in a relationship with you no more because you a part of me." She moved into an apartment, but "[i]t got worse" behind closed

doors. During her pregnancy, he was physically violent—he hit her in the face with a closed fist, beat her, and dragged her around the house.

**{¶19}** She recalled many instances of abuse. He abused her in front of their daughter and as Cook held their daughter. There were multiple fights at the Shell station. If Cook went to the convenience store, Dickey "would be hanging out in front of the store probably trying to steal drugs or doing whatever he was doing." He would make a comment, and following any pushback from Cook, "it would get physical."

**{¶20}** She recalled being assaulted by Dickey for her car keys and to use her car. One time when Dickey dropped off Cook and their infant child at her sister's house, he started to drive away as Cook was removing their child from the car, nearly causing their child to "fall out the car." Another time, Dickey nearly hit Cook with a car, speeding towards her but "as soon as he got close–like really close to me, he hit the brakes, then stopped. * * * Screeched the brakes." He also aimed a firearm at Cook as she held their child. In addition to the physical violence, Cook described Dickey's emotionally manipulative behavior.

**{¶21}** Turning to the date of the incident, Cook explained that she had a protective order against Dickey, who was "fresh out of jail." Cook contacted Dickey about an issue with one of his friends. Dickey met Cook at the gas station and started to argue. She "wasn't really like aggressive toward him" and he was "out of character because I feel like he was intoxicated." He bit her, punched her, and hit her. When she finally got back into her car, she was hit with a squeegee and she

> [d]ucked under my, like, steering wheel. I ducked under the wheel, and
> I hit the gas, and I tried to turn to the left towards the laundromat. And
> before you know it, I just hear a big, old boom. I hit the -- I hit the pole
> in front of the store and knocked it down.

{¶22} She denied trying to hit Dickey. On cross-examination, she testified that she was "blacked out" and "wasn't in my logical mind." She explained that she was thinking "just pull out, just pull out, I've been at this store since I've been like two." Cook explained that she knew "if I turned the wheel, either I'm going to accidentally hit one of the * * * gas pumps or I'm going to pull straight out into the laundromat or Harrison Avenue." Her grandfather lived on a street off Harrison Avenue, and she had to drive across the parking lot to get there.

{¶23} She testified that, in the moment, she thought Dickey was "on the side of me trying to hit me with a pole or something." She did not see "him run, walk, nothing away from my car." She could not see where she was driving. She "blacked out," driving across the parking lot. After the crash, she got out of her SUV and "pulled my truck off of him because he was no longer attacking me." She jumped in a car occupied by two bystanders and called 911 as she left the scene.

### *The trial court found Cook guilty of felonious assault*

{¶24} The trial court found Cook guilty of both assault counts. It credited Dr. Fischer with her explanation of battered woman syndrome and fight-or-flight responses, but considered the surveillance footage "strong." Specifically, the trial court explained the surveillance footage made it "clear that Mr. Dickey, right before he was hit by the car, had moved away from the car" and "Cook drove the car, turned the car in the direction of him and accelerated and drove straight toward him and crashed into him and ran him over."

{¶25} The trial court found that Cook "was not fleeing from abuse, but, instead, she was able to form and execute the plan to drive, and to drive directly toward and crash into and run over Mr. Dickey."

8

**{¶26}** Recognizing that this finding was at odds with Dr. Fischer's testimony and expert opinion, the trial court reasoned:

Dr. Fischer did not see the video that I saw, and she did not hear Ms. Cook's testimony on direct and in cross that she had formed a plan and that she was executing her plan. In other words, she was not in the fight or flight system 1 reaction; she was in the system 2 planning reaction. Ms. Cook testified on direct that her intent was to flee. Ms. Cook testified on cross her plan was to drive out of the station. This testimony, under my theory of the defense is using the expert witness as to showing that she could not form the intent.

\* \* \*

The video undermines Ms. Cook's testimony that she could not see where she was going, and that she was trying to go to Harrison Avenue, all she had to do was turn left and go out the exit at the gas station, and be on her way. She didn't do that. She turned and headed directly toward Mr. Dickey, basically following him as he ran and also accelerating toward him until she crashed into him, ran him over, and hit the building. All of this was clear on State's Exhibit 1 at 1:45:25 through 1:45:29. This all happened roughly within a minute.

**{¶27}** The trial court sentenced Cook to two to three years in prison on count two, and merged count one into count two.

**{¶28}** Cook appeals and challenges her conviction in two assignments of error.

## II. Law and Analysis

**{¶29}** In her first assignment of error, Cook argues that the state's evidence failed to establish that she knowingly struck Dickey with her SUV. In her second

9

assignment of error, Cook contends that her conviction is against the manifest weight of the evidence. While Cook argues these assignments together, "[s]ufficiency and manifest weight are different legal concepts." *State v. Mack*, 8th Dist. Cuyahoga No. 109514, 2021-Ohio-1102, ¶ 17.

### *The state's evidence, if believed, proves that Cook acted knowingly*

**{¶30}** When determining whether the state presented sufficient evidence to support a conviction, this court must consider " ' "the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, [to see if] any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." ' " *State v. Sipple*, 2021-Ohio-1319, 170 N.E.3d 1273, ¶ 7 (1st Dist.), quoting *State v. MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, ¶ 12, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). This court "does not ask whether the evidence should be believed or assess the evidence's 'credibility or effect in inducing belief' "; rather, the question is "whether the evidence against [Cook], *if believed,* supports the conviction." (Emphasis in original.) *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 16, quoting *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13.

**{¶31}** To prove that Cook committed felonious assault in violation of R.C. 2901.11(A)(1), the evidence must show that she knowingly caused harm to Dickey. To prove that Cook acted knowingly when she struck Dickey with her SUV, the evidence must show that she was "aware that [her] conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). We have explained, " '[b]ecause the intent of an accused person is only in his mind and is not ascertainable by another, it cannot be proven by direct testimony of another person but must be

determined from the surrounding facts and circumstances.' " *State v. Hudson*, 1st Dist. Hamilton No. C-170681, 2019-Ohio-3497, ¶ 10, quoting *State v. Huff,* 145 Ohio App.3d 555, 563, 763 N.E.2d 695 (1st Dist.). Indeed, we consider "circumstantial evidence surrounding these events to evaluate intent," and presume that a person " 'intended the natural, reasonable and probable consequences of their voluntary acts.' " *State v. Adams*, 2019-Ohio-3597, 143 N.E.3d 1140, ¶ 8 (1st Dist.), quoting *State v. Capone,* 8th Dist. Cuyahoga No. 86281, 2006-Ohio-1537, ¶ 32.

{¶32} Cook acknowledges that the surveillance footage shows Cook behind the wheel of her SUV "follow[ing] Dickey's path as he runs toward the building until finally running him over." And as the trial court noted, Cook testified that she intentionally turned left to get to Harrison Ave, which suggests that she was operating the vehicle with a level of intentionality. While Dr. Fisher opined that Cook's actions were the result of her flight response, "[a] trial court is not required to automatically accept expert opinions offered from the witness stand." *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 71. When viewed in a light most favorable to the state, a rational trier of fact could have found that Cook knowingly struck Dickey with her SUV.

{¶33} Because a rational trier of fact could have found that Cook acted knowingly, we overrule Cook's first assignment of error.

### *We defer to the trial court's credibility determinations*

{¶34} Cook's arguments are better tailored to her second assignment of error, where she argues that her conviction is against the manifest weight of the evidence. She claims that expert testimony established that she did not knowingly drive her SUV into Dickey and the trial court's findings otherwise were the result of flawed reasoning and a misunderstanding of her expert.

11

{¶35} When a defendant claims her conviction is against the manifest weight of the evidence, we must review " ' "the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." ' " *State v. Morris*, 1st Dist. Hamilton No. C-220073, 2022-Ohio-4597, ¶ 20, quoting *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 59, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In doing so, we afford deference to the trial court "on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *Id.*, citing *Bailey* at ¶ 63. We will reverse a conviction in " 'exceptional cases in which the evidence weighs heavily against the conviction.' " *Sipple*, 2021-Ohio-1319, 170 N.E.3d 1273, at ¶ 7, quoting *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717.

{¶36} Cook begins with an emphasis on her testimony that she was unaware that Dickey was in front of her SUV as she ducked under the steering wheel. To be sure, she testified that she could not see where she was driving, did not intentionally strike him with her car, and did not expect to hit Dickey. But, as the trial court explained, Cook's SUV follows a direct path toward Dickey. And " '[t]he trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented.' " *State v. Bullock*, 1st Dist. Hamilton Nos. C-210256 and C-210257, 2022-Ohio-925, ¶ 14, quoting *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16.

{¶37} Cook challenges the trial court's reasoning that Dr. Fischer did not view the surveillance video that was played in court and its disagreement about whether

Cook operated the SUV out of a flight response. Cook insists that there was only one video and therefore Dr. Fischer's testimony should be afforded more weight.

**{¶38}** There is only one video in the record. But Dr. Fischer unequivocally testified that she watched footage showing the events from "a different vantage point." She explained that "the angle that I saw was to the rear of these individual[s]. So you're sort of looking at them as if they're in front of you, not – and they're moving, you know, from the – near side of the car backwards." When she watched the footage admitted into evidence in court, she explained "[i]t looks very different though, the driving into him than the other video does" and that, in the other footage:

> You actually see the angle of her car kind of drift off towards the store, whereas, the angle on this surveillance video, because its [sic] not from the back, it's from the side, makes the way the car drove onto the side look very different.

In fact, Cook's testimony also suggests the existence of additional footage. Cook was shown the gas-station footage at trial and explained, "I've seen this video, but I more so seen the other video."

**{¶39}** Finally, Cook maintains that the evidence contains no expert testimony refuting Dr. Fischer's conclusion that Cook operated the vehicle as a flight response, making it "improper for the court to conclude" otherwise. But again, "[e]xpert testimony, even when uncontradicted, is not necessarily conclusive." *State v. Dickerson,* 45 Ohio St.3d 206, 210, 543 N.E.2d 1250 (1989); *State v. McBride,* 1st Dist. Hamilton No. C-200443, 2023 Ohio App. LEXIS 29 (Jan.6, 2023) ("[A] trial court is not required to automatically accept an expert opinion."). While "expert opinion 'may not be arbitrarily ignored, and some reason must be objectively present for ignoring expert opinion testimony,' " the surveillance footage and Cook's testimony undermine

13

Dr. Fischer's testimony that Cook did not knowingly drive across the parking lot and strike Dickey. *See State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 71, quoting *United States v. Hall*, 583 F.2d 1288, 1294 (5th Cir.1978). In this regard, " '[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's [evidence] rather than the defendant's version of the events.' " *State v. Green*, 3d Dist. Marion No. 9-22-13, 2023-Ohio-4360, ¶ 136, quoting *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16.

{¶40} Because we defer to the trial court's credibility determination, Cook's conviction is not against the manifest weight of the evidence. We overrule her second assignment of error.

### III. Conclusion

{¶41} We overrule Cook's two assignments of error and affirm her conviction.

Judgment affirmed.

**WINKLER** and **KINSLEY, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.

14